IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DANNY W. EUBANKS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 03-427-WDS |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## Report and Recommendation

This Report and Recommendation is respectfully submitted to United States District Judge William D. Stiehl pursuant to **28 U.S.C. § 636(b)(1)(B)**.

Danny W. Eubanks seeks judicial review under **42 U.S.C. § 405(g)** of a final agency decision denying him Supplemental Security Benefits (SSI). The decision is two-fold. First, the decision terminates SSI benefits received by him as a minor. Secondly, the decision finds that he is not disabled and denies him SSI benefits as an adult. Plaintiff contends that he met the listing for mental retardation as a child (Listing 112.05) and that he continues to meet the listing for mental retardation as an adult (Listing 12.05). Administrative remedies have been exhausted, and the request for judicial review was timely filed in this court.

## Procedural History

Eubanks was born on March 20, 1982. (Tr. 49). An application for SSI benefits was filed on his behalf in 1995, and he was found to be disabled and eligible for benefits as of September 1, 1995. (Tr. 286). The disability determination was based on a primary diagnosis of attention deficit hyperactivity disorder, with a secondary diagnosis of history of oppositional

1

defiant disorder. (Tr. 134).

In 1996, Congress amended the standard for disability for children seeking SSI benefits. **42 U.S.C. §1382c(a)(3)(C).** Congress also mandated that the Social Security Administration make a redetermination of disability using the revised standard. **Pub. L. 104-193, §211(d)(2) [set out as a note to 42U.S.C. §1382c.]**

The agency conducted a redetermination review, which included a hearing. (Tr. 33-59). On September 23, 1999, the ALJ determined that plaintiff was not entitled to benefits under the new standard. (Tr. 283-291). Plaintiff, who was represented by counsel, requested review by the Appeals Council. On March 14, 2002, the Appeals Council vacated the ALJ's decision and remanded for further proceedings, including a determination of whether Eubanks met the adult standard for disability, as he turned eighteen on March 20, 2000. (Tr. 296-298).

A second hearing was held on November 20, 2002, before ALJ Anne C. Thomas. (Tr. 60-87). On January 28, 2003, ALJ Thomas issued a decision finding that Eubanks' entitlement to childhood disability benefits ceased as of July 1, 1997, and that he was not entitled to SSI benefits as an adult. (Tr. 302-311). Plaintiff's request for review was denied, and the January 28, 2003, decision became the final agency decision. (Tr. 298).

Plaintiff filed a timely action for review in this court. The Commissioner moved for remand because the agency was unable to locate the claim file or the tape of the November 20, 2002, hearing. That motion was granted on May 5, 2004. **See, Docs. 9 & 14**. The January 28, 2003, decision was vacated. (Tr. 387).

A third hearing was held on February 21, 2006, before ALJ George A. Mills, III. (Tr. 88-133). ALJ Mills issued a decision on July 6, 2006, finding that Eubanks was not disabled as a

2

child, and that he was not disabled as an adult. (T. 8-29). The July 6, 2006, decision became the final agency decision and is now before the court. (Tr. 417).

## Issues

Plaintiff contends that the decision of the Commissioner was erroneous because he met Listing 112.05, which is the childhood listing for mental retardation. Plaintiff's IQ tested at 67 in 1999, and at 86 in 2006. Plaintiff argues that he met Listing 112.05 on the basis of the 1999 IQ score of 67. He asserts that the ALJ erred in finding that he had medical improvement, and in evaluating the validity of the 1999 IQ testing.

## Standard for Determining Child Disability

The Personal Responsibility and Work Opportunity Act, passed by Congress in 1996, revised the standard for disability in a child under the age of 18. Prior to that change, the standard for childhood disability was whether the child had a medically determinable physical or mental impairment, which has lasted or is expected to last for more than 12 months, that was "of comparable severity" to an impairment that would be considered disabling in an adult. The revised standard for childhood disability abandons the "comparable severity" analysis. The revised standard is whether the child has a medically determinable physical or mental impairment "which results in marked and severe functional limitations" and which has lasted or is expected to last for more than 12 months. The new standard is considered to be more restrictive than the old comparable severity standard. **See, *Williams v. Apfel*, 79 F. 3d 1066, footnote 3 (7th Cir. 1999)**.

The agency published interim final rules implementing the new standard on February 11, 1997, and final agency rules on September 11, 2000. The final rules became effective on

January 2, 2001, at which time plaintiff's case was pending before the Appeals Council.

Plaintiff's brief refers only to the five-step analysis that is used to determine adult disability. However, the analysis of childhood disability is different. The determination of childhood disability proceeds by way of a three-step sequential analysis set forth in **20 CFR §416.924(a)**. The three-step analysis is as follows:

1. Is the child claimant engaged in substantial gainful activity?

2. Does the child have an impairment or combination of impairments that is "severe?"

3. Does the impairment or combination of impairments meet, medically equal, or functionally equal the severity of a listed impairment?

An answer of "yes" to the first question, or "no" to the second or third questions, means that the child is not disabled.

Both the interim final rules and the final rules define the statutory standard of "marked and severe functional limitation" with reference to severity of a listed impairment, as stated in step 3 above.

The final rules, effective in 2001, provide that functional equivalence requires that the impairment be of listing-level severity. Listing-level severity means that the child has marked limitation in two domains of functioning, or extreme limitation in one domain. **20 CFR §416.926a**.

## Standard for Determining Adult Disability

To qualify for disability insurance benefits, a claimant must be "disabled." "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C.§§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and she is not capable of performing her past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See,** *Bowen v. Yuckert*, **482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987);** *Knight v. Chater*, **55 F.3d 309, 313 (7th Cir. 1995).**

### Standard of Review

The standard of review for this court is well established. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** This Court must determine whether ALJ Mills' findings

5

were supported by substantial evidence, and, of course, whether any errors of law were made. **See, *Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).** An ALJ may not disregard evidence when there is no contradictory evidence. ***Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).** In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).** The "resolution of competing arguments based on the record is for the ALJ, not the court." ***Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002)**.

## The Record

The court has reviewed and considered the entire record in formulating this Report and Recommendation. Because of the narrowness of the issues raised by plaintiff, the following discussion of the record is limited to a summarization of only the most pertinent portions of the extensive written record.[1]

**1.      Hearing, February 21, 2006**

Plaintiff was twenty-three at the time of the hearing. (Tr. 98). He was not married. (Tr. 98). He has a daughter who was five years old at the time. The child lives with her mother and plaintiff does not support her. (Tr. 119-120).

---

[1] Issues that are not raised in this court are waived. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

6

Eubanks has never worked at a full-time job for any length of time.[2] He testified that it makes him "nervous" to be around people and he does not like to be told what to do. (Tr. 116-117). He testified that he is unable to work because he has low IQ, a breathing problem, and back pain resulting from a car accident. He also claimed to have some kind of heart problem. (Tr. 102-104). He has had no treatment for his back. (Tr. 107).

Plaintiff testified that he has asthma. He has never been hospitalized for same, but has had some emergency visits. He had one emergency room visit since he got out of prison. (Tr. 120-121).

Plaintiff was in prison from October 24, 2003, until October 12, 2004. Plaintiff testified that the charge was leaving the scene of an accident. (Tr. 102, 105, 117).[3] At the time of the hearing, he was living with his aunt, who supports him with some help from his grandmother. (Tr. 111-112).

Plaintiff completed the eighth grade. He did not get a GED. He can read, but not well. He is "not good with numbers." He has a drivers license. He has had no vocational training. After he quit school, he "stayed at home." (Tr. 99-101).

He had behavioral problems in school and was in special classes. (Tr. 114).

Eubanks denied using drugs or alcohol as a teenager. He also denied being charged with any juvenile crimes. (Tr. 101).

---

[2]His earnings records reflect total lifetime earnings through 2005 of about $1,000.00. Tr. 328.

[3]Documents from the Illinois Department of Corrections indicates that plaintiff was imprisoned on a charge of delivery of a controlled substance (methamphetamine) as well as failure to report an accident. Tr. 326-327, 377.

He has not had any treatment since he got out of prison. (Tr. 108).

Plaintiff testified that he does not do much of anything. He does not go anywhere. He watches television and listens to the radio. (Tr. 112).

James Bordieri testified as a vocational expert. (Tr. 123). The ALJ asked a hypothetical question assuming a person of plaintiff's age, with limited education, borderline intellectual functioning and learning disability, with no exertional limitations, but with a need to avoid concentrated exposure to fumes, gasses, and the like due to asthma, and limited to simple, routine tasks, with little interaction with supervisors, coworkers, and the general public. (Tr. 124). Dr. Bordieri testified that there are jobs in significant numbers that such a person could perform. Examples that he gave are groundskeeper (7,600 positions), stock handler (19,000 positions), greenhouse worker (2,800 positions), and newspaper delivery (3,700). (Tr. 124-125).

**2.      School records**

School records from 1995, at which time plaintiff was about 13 years old, indicate that he was in "behavioral disorder classes." He tested at the fourth grade level in math and spelling and the fifth grade level in reading (Tr. 145, 153).

**3.      Gary Albers, M. D.,**

Dr. Albers, a pulmonologist at Cardinal Glennon Children's Hospital in St. Louis, Missouri, evaluated Eubanks for chest pain and breathing complaints in 1993. He concluded that plaintiff had "no significant chronic pulmonary problems" and recommended that medications be discontinued. (Tr. 154-156).

**4.      Valjean Cashen, Psychologist**

Dr. Cashen evaluated Eubanks on December 18, 1995, at age 13. He notes that plaintiff denied any use of alcohol or drugs, and stated that he was in special education and was getting Bs and Cs in school. He concluded that plaintiff was functioning in the low average range of intelligence. (Tr. 158-159).

**5.     Rea Clinic**

Plaintiff was treated by various doctors at the Rea Clinic, who appeared to have acted as family doctors. Doctors there diagnosed him with ADD and prescribed Ritalin beginning in September, 1995. (Tr. 164-167, 252).

**6.     St. Mary's Hospital**

Eubanks was admitted to St. Mary's Hospital in Centralia, Illinois, on September 15, 1996, for drug and alcohol abuse. He was noted to have become aggressive and destructive, and to have had problems with running away, talking back, and behavioral problems. He reported heavy marihuana and alcohol use, with "some use of mushrooms." He was admitted for three days, and further inpatient treatment was recommended, but the family refused. (Tr. 230).

He was noted to be essentially healthy, and intellectually "about average," although he was doing poorly in school and was failing five subjects. (Tr. 231, 233).

**7.     Franklin-Williamson Human Services**

Plaintiff received counseling from 1994 through 1996. He was in family counseling for ADHD, oppositional defiant disorder, parent-child problems, and sibling rivalry (Tr. 196-228). He was noted to have impulse and attention problems. (Tr. 211). In March 1996, a counselor noted that he achieved below his intellectual ability, presented with no impairment of recent or remote memory, and listed as a strength his "good expressive language and communication

9

skills," "good physical health," and "intellectual resources and insight." (Tr. 204-205).

**8.      Psychiatric Examinations**

On June 12, 1997, James S. Peterson, Ph.D., performed a mental status examination. Plaintiff was uncooperative and gave minimal information. At one point, he became angry and left the examining room. He displayed a "negative and rebellious attitude." Dr. Peterson saw no diagnosable psychological problem. (Tr. 256-257).

On January 6, 1999, Bruce Amble, Ph.D., performed a psychological examination. Plaintiff was 16 years and 8 months old. He appeared to be "tired and mildly lethargic." His hands and fingernails were dirty and he had noticeable body odor. His attention span was short, but he had sufficient concentration for testing. He displayed almost constant, extraneous motor behavior, and Dr. Amble sometimes had to repeat questions. His responses were cautious and tentative. His speech was clear and fluent. At that time, plaintiff was living with his father, who received disability payments. Testing showed that he was reading at the fifth grade level, and he could do simple addition and subtraction problems. The results of the Minnesota Multiphasic Personality Inventory were felt to be invalid. The Weschler Adult Intelligence Scale showed him to "have a pattern of borderline to mild mental retardation." His full scale IQ was 67. (Tr. 267-271).

On May 2, 2002, Stephen G. Vincent, Ph.D., performed a mental status evaluation. At that time, plaintiff was 20 years old. Dr. Vincent reviewed Dr. Amble's report indicating borderline to mild mental retardation. Dr. Vincent noted that plaintiff's hygiene and grooming were intact, and he was living with his grandmother. He had a driver's license. He admitted to legal problems as a juvenile. His mood was somewhat anxious. His effort was fair. He was

able to remember five numbers forward and four numbers backward. He gave his social security number from memory. He could name the present and three past presidents. He could name three large cities and three famous people. He was able to do serial threes, but refused to try to do serial sevens or to do multiplication or division. He was able to interpret a proverb, but showed some concreteness of thought. Dr. Vincent concluded that he had adjustment disorder and borderline intellectual functioning. (Tr. 278-280).

On August 15, 2003 , Richard C. Parks, M.D., a psychiatrist, evaluated plaintiff. Plaintiff was noted to be cooperative. His immediate, recent, and remote memory were intact, but his insight was impaired. He told Dr. Parks that he had a hard time concentrating and focusing, and his mind felt scattered and disjointed. He said that he avoids people. Dr. Parks diagnosed ADHD with depression and social phobias, as well as avoidant type personality, and gave plaintiff samples of Lexapro for his depressive symptoms (Tr. 373-374).

James S. Peterson, Ph.D., examined plaintiff again on April 19, 2006. In contrast to Eubanks' behavior on the prior exam, this time he was quiet and cooperative, and made an earnest effort during IQ and achievement testing. His full scale IQ score was 86. This score is in the low average range of functioning, and Dr. Peterson stated that, given Eubanks' limited educational background, his scores were "as one would expect." WRAT-3 testing in reading, spelling, and arithmetic also yielded scores that were consistent with the IQ testing, and showed low average competency. However, the results on the MMPI-II were invalid; the configuration of the results on that testing was "typical of a 'fake-bad' test result," indicating a "deliberate attempt on the part of the test taker to appear more psychologically disturbed than is actually the case." (Tr. 400-402).

11

**Analysis**

Plaintiff divides his argument into three points, but all three points are really aspects of the same contention, that is, that the ALJ erred in not finding that plaintiff met Listing 112.05 (childhood mental retardation) because he had an IQ of 67 and a mental impairment. **See, Doc. 23, p. 8.** These are the requirements of Listing 112.05.D.

Plaintiff first suggests that the ALJ erred in finding that his impairment had improved, i.e., that his IQ improved from 67 to 86. Plaintiff argues that the ALJ erred in applying 20 C.F.R. §404.1594. That section concerns assessment of medical improvement. This point has no merit because medical improvement in not in issue in a case such as this.

When Congress passed the Personal Responsibility and Work Opportunity Act in 1996, it also mandated that the Commissioner redetermine the eligibility of all persons under the age of 18 who were receiving SSI benefits due to disability. **Pub. L. 104-193, §211(d)(2) [set out as a note to 42U.S.C. §1382c.] Section 211(d)(2)** provides that, in such redeterminations, "42U.S.C. §1382c(a)(4) shall not apply." In other words, Congress directed the Commissioner to make a redetermination of the child's eligibility for SSI disability benefits under the revised standard *without regard to medical improvement*.

In any event, plaintiff's argument misconstrues the ALJ's decision. The ALJ did not find that Eubanks experienced an improvement in his IQ. Rather, the ALJ found that the first IQ test, the one on which plaintiff relies, was not a valid test. The ALJ noted that Dr. Amble, who administered the 1999 test, stated that plaintiff appeared tired and lethargic, and his attention span was short during the testing. (Tr. 14). He also noted that some of Dr. Amble's mental status findings were inconsistent with other information in the record. (Tr. 16). The ALJ noted

that Dr. Cashen assessed plaintiff as functioning in the low average range of intelligence. (Tr. 14).

Plaintiff's entire argument rests on the proposition that the ALJ had to accept the results of the IQ test administered by Dr. Amble in 1999. That is a faulty premise.

By its terms, Listing 112.05 requires a "valid" IQ score. It is appropriate for the ALJ to consider factors such as the claimant's condition and demeanor during IQ testing and whether the results of the testing are consistent with other evidence in the record. **See, *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).**

The evidence establishes that no one except Dr. Amble ever diagnosed plaintiff with mental retardation. Plaintiff was assessed as being "about average" intellectually when he was an inpatient at St. Mary's Hospital in 1996. At Franklin-Williamson Human Services, where he was counseled from 1994 through 1996, his "intellectual resources and insight" were noted to be among his strengths. (Tr. 204-205). In 2002, Dr. Vincent assessed his intellectual functioning as borderline. (Tr. 280). In 2006, Dr. Peterson found that plaintiff's IQ was 86, which is in the low average range. (Tr. 400-402).

This Court's role is to determine whether the ALJ's decision was supported by substantial evidence, and not to weigh the evidence anew or substitute its judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. ALJ Mills weighed the competing evidence, including the two different IQ scores, and reasonably determined that the first, lower, score was the result of invalid testing. While that conclusion is not necessarily the only conclusion compelled by the record, it is sufficiently supported by substantial evidence in the record and must therefore be accepted by this Court. ***Delgado v. Bowen*, 782 F.2d 79, 82 (7th**

**Cir.1986).**

Without the low score on the first IQ test, there is no basis for a finding that plaintiff met the requirements of Listing 112.05. Thus, the ALJ did not err in concluding upon redetermination that Eubanks did not meet the requirements for childhood disability.

Plaintiff does not advance any argument at all for why is disabled as an adult. The ALJ applied the correct five-step sequential analysis. (Tr. 19-20). In order to find that plaintiff meets the requirements of the adult mental retardation listing, one would have to find that the IQ test administered by Dr. Peterson in 2006 was invalid. However, the ALJ found that those results were valid, Tr. 21, and plaintiff has not suggested any reason to reject that finding.

Plaintiff has not raised any other issues. In particular, he has not challenged the ALJ's findings as to his credibility, or the ALJ's findings regarding his alleged physical conditions.

### Recommendation

The decision of the ALJ is supported by substantial evidence in the record as a whole, and no errors of law were made. Therefore, this court recommends that the final decision of the Commissioner of Social Security, finding that plaintiff Danny W. Eubanks is not disabled, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **March 10, 2008.**

**Submitted: February 22, 2008.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**